## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| ANTHONY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  14 CV 2155 |
| | ) | |
| v. | ) | Judge Colin Stirling Bruce |
| | ) | Magistrate Judge Eric I. Long |
| OFFICER LATHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | **JURY DEMAND** |

### DEFENDANTS LACEY ZINGRE AND GARY TISON'S
### MOTION FOR SUMMARY JUDGMENT AND DEFENDANT
### BRAD LATHAM'S MOTION FOR SUMMARY JUDGMENT
### (ONLY AS TO COUNT VII OF THE AMENDED COMPLAINT)

### INTRODUCTION

Plaintiff Anthony Johnson filed his Amended Complaint in this case on April 22, 2015. Johnson claims in his lawsuit that in the evening on February 18, 2014, he was subjected to excessive force, falsely arrested and maliciously prosecuted by a City of Kankakee police officer, Brad Latham.   Johnson initially sued a number of other defendants, including Kankakee County and County Correctional Officer Jeremy Most (for an alleged strip search which occurred after his arrest) but Johnson later dismissed those claims so Counts VIII and X-XIII of the Amended Complaint are no longer part of the case.  Additionally, on May 24, 2016, Johnson filed an unopposed motion to dismiss an intentional infliction of emotional distress claim against Officer Latham (Count VI).

Johnson's remaining claims include federal claims against Officer Latham for excessive force (Count I) and false arrest (Count III), as well as pendent state law claims for false arrest (Count IV), battery (Count V), and malicious prosecution (Count VII).  The City of Kankakee is sued solely because of its statutory duty to indemnify its officers for compensatory damage

awards entered against them (Count IX: 745 ILCS 10/9-102).

Johnson, however, has also sued two other City of Kankakee patrol officers, Lacey Zingre and Gary Tison, who were at the scene when the events giving rise to the litigation occurred. In Count II, Johnson claims that Officers Zingre and Tison allegedly failed to intervene to prevent Officer Latham's alleged use of excessive force. In Count III, Johnson alleges that Officer Zingre and Tison were also responsible for Officer Latham's allegedly unlawful arrest of Johnson. Zingre and Tison now move for summary judgment as to both counts asserted against them (Counts II and III, respectively). Additionally, Latham is moving for summary judgment on Johnson's state law malicious prosecution claim (Count VII).

## UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION

### The Parties

1.      On February 18, 2014, Plaintiff Anthony Johnson was living by himself at 543 N. Washington, Kankakee, Illinois. Anthony Johnson's Dep., p. 6, attached hereto as Exhibit A.

2.      Johnson was convicted of theft in Cook County in both 2007 and 2008. Ex. A, Johnson Dep., pp. 20-21.

3.      Defendants Brad Latham, Lacey Zingre and Gary Tison were and are still each employed as City of Kankakee police officers. Amended Complaint, ¶¶ 3-5, attached hereto as Exhibit B.

4.      Officer Zingre was hired by Kankakee in September 2013 and received training immediately thereafter at the Police Training Institute in Champaign, Illinois. Lacey Zingre Deposition, pp. 5-6, attached hereto as Exhibit C.

5.      On February 18, 2014, Officer Zingre was still a new officer and was with her field training officer, Officer Latham. The two officers were working patrol that evening and were

driving in Officer Latham's marked squad car. Ex. C, Zingre Dep., pp. 21-22; Brad Latham's Deposition, pp. 20-21, attached hereto as Exhibit D.

6.      As a field training officer, Officer Latham was Officer Zingre's direct supervisor that evening and was responsible for her actions.  Ex. D, Latham Dep., pp. 22-23.

### The Events on February 18, 2014

7.      In the early evening of February 18, 2014, Johnson had several friends over to his house, including Porter Chandler, Marcus Allen, Darren Tucker and Steve Yarborough, and the men were eating and drinking beer.  Johnson's Dep., pp. 27-28, 33-34.

8.       Johnson claims that he only had "a couple" of beers before the police arrived at his house.  *Id.*

9.      According to Darren Tucker, Johnson's friends had purchased three cases of Icehouse beer (90 beers altogether), along with a bottle of Amsterdam Vodka, with the intent of drinking that evening until no more alcohol was left.  Darren Tucker Deposition, pp. 34-37, 103-04, attached hereto as Exhibit E.

10.     Tucker drank 6-7 beers himself before the police arrived that evening and believed that Johnson also drank the same amount of beer ("in the same range").  *Id.*[1]

11.     While some of Johnson's friends stayed inside the house playing cards, others hung outside Johnson's house.  Ex. E, Tucker Dep., pp. 40-41; Ex. A, Johnson Dep., pp. 27-28.

12.     Johnson's immediate neighbor to the north was a retired Vietnam veteran named Ray Norrick, who lived at 557 North Washington Street.  Ray Norrick Deposition, pp. 5-9, attached hereto as Exhibit F.  Between the two houses lie a rectangular vacant lot.  *Id.* at p. 9.

---

[1] Johnson would subsequently tell one of his medical providers, Rebecca Carter, that he would drink a six pack of beer every day and Carter told him that this suggested to her that Johnson was an alcoholic.  Ex. A, Johnson Dep., p. 130.

13.     Norrick returned home on February 18, 2014 with his girlfriend only to be bad-mouthed by two of Johnson's friends as Norrick and his girlfriend entered his house. *Id.* at pp. 17-19.  After going inside his house, Norrick heard the sound of snowballs hitting his house. *Id.* at pp. 19-23.  At some point, Norrick heard the sound of breaking glass, determined that the men had thrown a snowball through his bedroom window, and exited his house to confront Johnson's friends. *Id.* at pp. 20-24.

14.     Norrick told Johnson's friends that someone was going to pay for the window that they had just broken but the men told Norrick to get his "perverted ass" back in the house; walking back inside his house, Norrick told the men to have Johnson come outside. *Id.*

15.     Once inside, Norrick could again hear the sound of more snowballs pelting his house. *Id.* at p. 25.  Now irate at the damage to his property and the hostile behavior of Johnson's friends, Norrick called 911 to report the damage to his property. *Id.* at pp. 25-29.

16.     Norrick told the 911 dispatcher that friends of his neighbor had been throwing snowballs at his house and threatening him.  During the call, Norrick described one of Johnson's friends (i.e., black male, cap, winter coat, dungarees) and identified the address of Johnson's house, indicating that was where the men were located.   DVD–audio of 911 call and police radio traffic with dispatch, attached hereto as Exhibit G.

17.     After calling the police, Norrick went outside and informed Johnson's friends that he had called the police, that they would be there any minute, and that the two men should have Johnson come outside.  Ex. F, Norrick Dep., pp. 25-29.

18.     At that time, Officers Latham and Zingre were in Officer Latham's squad car, approximately four miles from the scene.  The officers were then advised on the radio that Norrick had called about his broken window and were also given Norrick's address and a

description of what the perpetrator had been wearing.  Ex. D, Latham Dep., pp. 24-26.

19.     When the police arrived at the scene (at around 7:00 p.m.), Officers Latham and Zingre walked up to Norrick's house and spoke with Norrick, who was standing at the front door.  Ex. F, Norrick Dep., pp. 35-37; Ex. A, Johnson Dep., p. 27; Ex. C, Zingre Dep., pp. 21-22; Ex. D, Latham Dep., pp. 36-45.

20.     By this time, night had already fallen and it was dark outside.  Ex. E, Tucker Dep., p. 48.

21.      Norrick told the officers about how two men had been throwing snowballs at his house and how they had broken his bedroom window, with Norrick showing the officers his just broken window.   Ex. F, Norrick Dep., pp. 35-37; Ex. A, Johnson Dep., p. 27; Ex. C, Zingre Dep., pp. 21-22; Ex. D, Latham Dep., pp. 36-45.

22.     Norrick told the officers that the house directly to the south was owned by Anthony Johnson and that it had been Johnson's friends who had thrown the snowballs at his house.  *Id.*

23.     Officer Tison also arrived at the scene during this time.  Norrick recalls that, while one officer spoke with him, the other officers dealt with Johnson and his entourage.  Ex. F, Norrick Dep., pp. 37-41.

24.     After speaking with Norrick, Officer Latham began to walk towards Johnson, who was near the curb in front of his house.  Officer Latham then spoke with Johnson, asking him what happened.  Ex. A, Johnson Dep., pp. 38-41; Ex. D, Latham Dep., pp. 45-49, 53-55.

25.     According to Norrick, Johnson remained "cool" during this time while Johnson's buddies were bad mouthing the officers and causing a ruckus.  Ex. F, Norrick Dep., pp. 37-41.

26.     Officer Zingre recalls Johnson acknowledging that one of his friends had been

throwing snowballs at Norrick's house but that this particular friend had left. Ex. C, Zingre Dep., p. 24.

27.      According to Officer Zingre, when the officers asked Johnson about the identity of his friends, Johnson's demeanor changed from calm and compliant to defensive and uncooperative. Ex. C, Zingre Dep., pp. 24-25.

28.      After speaking with Johnson for a bit, Officer Latham said "excuse me," told Johnson that he would be right back and walked over towards Officer Zingre and his squad car. Ex. A, Johnson Dep, pp. 41-43.

29.      Officer Latham radioed the dispatcher, asking for a local check on Anthony Johnson (a local check referring to a request to determine whether any warrants exist in Kankakee County on a person). Ex. C, Zingre Dep., pp. 33-34, 114; Ex. G, DVD Audio.

30.      The dispatcher asked the officers for Johnson's approximate age and the officers told the dispatcher that Johnson was approximately 40 years old. The dispatcher then indicated that there was an outstanding warrant for an Anthony Ray Johnson, born on August 4, 1966. Ex. C, Zingre Dep., pp. 33-34, 114.

31.      Officer Latham walked back towards Johnson and told him to put his hands behind his back and that there was an outstanding warrant for his arrest. Ex. A, Johnson Dep., pp. 44-45; Ex. E, Tucker Dep., p. 60.

32.      Johnson indicated that the warrant was not his. Ex. F, Norrick Dep., pp. 45-51, 56 Officer Latham responded that they would still "have to take [Johnson] in" until the matter was "cleared" and Latham went to handcuff Johnson. *Id.*

33.      Officer Latham made the decision to arrest Johnson and place him in handcuffs. Ex. D, Latham Dep., pp. 68-69.

34.     When Officer Latham began trying to handcuff Johnson, Johnson became upset and the two men began "tussling" against each other, with Latham trying to get Johnson's hands behind his back.  Ex. E, Tucker Dep., pp. 64.

35.     Upon hearing that he would be arrested, Johnson raised his voice and got upset, saying "this is bullshit."  Ex. F, Norrick Dep., pp. 45-51, 56-57.

36.     According to Norrick, Officer Latham did not use any unreasonable force when he went to handcuff Johnson.  Ex. F, Norrick Dep., pp. 47-48.

37.     According to Tucker, Officer Latham and Johnson were "struggling against each other" at the time but Latham was not punching, kicking, striking or otherwise assaulting Johnson.  Ex. E, Tucker Dep., pp. 66-68, 80-81.

38.     According to Officers Latham and Zingre, Johnson started to turn away from Officer Latham and began yelling and swearing at Officer Latham, saying that he did not have a warrant.  Ex. C, Zingre Dep., pp. 59-60; Ex. D, Latham Dep., pp. 70-71.

39.     While these events were going on, Tucker, Steve Yarborough and Marcus Allen all exited the back door of Johnson's house, with Tucker and Yarborough standing at the north edge of Johnson's house, approximately 40 yards from where Officer Latham and Johnson were talking to each other (between the two homes, near the north curb of the street).  Ex. E, Tucker Dep., pp. 57-60.

40.     When Johnson's friends streamed out of the house, Officer Zingre directed her attention at Johnson's friends, who were now yelling at the officers.  Additionally, one of Johnson's friends started recording the events on his camera phone.  Ex. C, Zingre Dep., pp. 59-60.

41.     Some of Johnson's friends were approaching the police and also "yelling and

threatening" the police.  At that point, Zingre's role changed and her attention was on Johnson's

friends.  Zingre was telling the men to "stay back" and to let Officer Latham "do what he needs to

do."  Ex. C, Zingre Dep., pp. 59-60.

42.     At this time, the entire situation was "chaotic."  Officer Latham began to walk

Johnson back towards the two City squad cars.  Ex. C, Zingre Dep., pp. 60-61.  While Officer

Zingre was mostly focusing on Johnson's friends, Zingre recalls seeing Johnson twisting, turning

and yelling while Latham attempted to escort Johnson towards the closest squad car (Officer

Tison's squad car).  *Id.*

43.     While all of this was going on, Porter Chandler returned to the scene and quickly

approached the officers from the south.   According to Officer Zingre, Chandler was trying to

"get in the middle" of things, and it was at that time that Officer Tison interceded, trying to keep

Chandler away from Officer Latham and Johnson.  Ex. F, Norrick Dep., pp. 37-41; Ex. E, Tucker

Dep. pp. 61-72; Ex. C, Zingre Dep., pp. 69-70.

44.     When Chandler got within 15' of Officer Tison, Tison tased him. Ex. F, Norrick

Dep., pp. 37-41; Ex. E, Tucker Dep. pp. 61-72; Ex. C, Zingre Dep., pp. 69-70.

45.     According to Tucker, Officer Tison was trying to prevent others from getting too

close to Officer Latham and Johnson when Tison tased Chandler and ordered Johnson's friends to

"get back" and "go in the house."  Ex. E, Tucker Dep., pp. 65-66.

46.      According to Norrick, the man who was tased by Officer Tison (Chandler) was

the same man who had been making derogatory comments to Norrick and who had been throwing

snowballs at Norrick's house.  Ex. F, Norrick Dep., pp. 41-42.

47.     With a number of events going on at the same time, Officer Zingre was a good

distance from Officer Latham and Johnson.  Ex. C, Zingre Dep., p. 62.  There were several times

during the course of events where Zingre was focusing on Johnson's friends and was not looking at Latham and Johnson. *Id.* at pp. 64-68.

48. Johnson testified that Officer Latham grabbed his arm, "slung" him towards the street, wrestled him to the ground and punched him several times after he was on the ground. Ex. A, Johnson Dep., pp. 46-50.[2]

49. Johnson testified, however, that things happened so quickly that he does not even recall how he ended up on the ground. *Id.*

50. According to Johnson, Officer Latham walked Johnson over to a squad car but Latham had to "force" him towards the car because Johnson was not walking. Ex. A, Johnson Dep., p. 54.

51. Neither Officer Zingre nor Officer Tison were in the immediate area at that time. Ex. A, Johnson Dep., pp. 47-48, 53, 64; Tison Dep., pp. 5-9, attached hereto as Exhibit H; Ex. C, Zingre Dep., pp. 59-60.

52. Johnson was never touched at any time by Officers Zingre or Tison and does not even recall ever seeing Officer Tison before he was placed in the squad car. Ex. A, Johnson Dep., pp. 53, 64; Ex. C, Zingre Dep. pp. 58-59.

53. In front of the squad car, Officer Latham asked Johnson for his name and date of birth so that he could confirm whether he had the right person; Johnson told Latham "Fuck you. I ain't telling you shit." Ex. D, Latham Dep., pp. 106-107.

---

[2] Officer Latham, who was the only defendant who even touched Johnson on the evening in question, denied using anything other than ordinary force to handcuff Johnson and place him in the squad car. Officer Latham denies that he threw Johnson to the ground or punched him when he was on the ground. Ex. D, Latham Dep., pp. 70-78, 116-119. Additionally, Defendants Zingre and Latham both denied that they ever saw Officer Latham engage in excessive force against Johnson. However, for purposes of summary judgment, Defendants accept Johnson's description of the events, which if true would suggest that Officer Latham used excessive force.

54.     Johnson claims that he was slammed against the trunk of the car by Officer Latham and that Latham placed his knee in Johnson's back.  Ex. A, Johnson Dep., pp. 55-58.

55.     Johnson claims that Officer Latham, after opening the door of the squad car, pushed him, punched him in the stomach and slammed the door of the squad car on Johnson's legs as Johnson moved to get inside the car.  *Id*.

56.     Neither Officer Tison nor Zingre was present when Officer Latham was with Johnson near the squad car.  Ex. D, Latham Dep., pp. 175-176.

57.     Officer Zingre never witnessed Officer Latham strike Johnson or otherwise use excessive force.  Ex. C, Zingre Dep., pp. 61-62.

58.     Officer Tison never witnessed Officer Latham use any excessive force against Johnson.  Ex. H, Tison Dep., pp. 63-64.

59.     Norrick did not see any officer throw Johnson onto the street or against a squad car or otherwise use force.  Ex. F, Norrick Dep., pp. 43-44.

60.     When Officer Latham was with Johnson, Officers Tison and Zingre were dealing with Chandler, with Zingre assisting Tison as he attempted to handcuff Chandler, and the two officers were also trying to keep Johnson's friends at bay since they were continuing to threaten the officers.  Ex. D, Latham Dep., pp. 177-182; Ex. C, Zingre Dep., pp. 59-62.

61.     Officer Zingre returned to Norrick's house and took Norrick's statement regarding what had happened before the officers' arrival at the scene.  Ex. F, Norrick Dep., pp. 51-53.

62.     Officers Latham and Zingre then got into the squad car and attempted to speak with Johnson about the arrest warrant that the dispatcher had reported.   As depicted on the DVD (Squad Car DVD - attached hereto as Exhibit I), Johnson was hostile and repeatedly refused to answer even simple questions, including questions about his birthday, telling the officers that he

"ain¢t got no birthday." *Id.*; Ex. A, Johnson Dep., pp. 80-82. Johnson told the officers to "take him to jail," noting that he already had a lawsuit against the Kankakee police. Ex. A, Johnson Dep., p. 82.

63.     While sitting in the backseat of the squad car, Johnson called Officer Latham "a bitch ass," a "hoe ass mother fucker," "a faggot ass," "a fucking pedophile" and a "faggot mother fucker." Ex. A, Johnson Dep., pp. 80-81, 95-96.

64.     Johnson told Officer Zingre in the squad car that he knew that she did not have anything to do with what happened to him. Ex. A, Johnson Dep., pp. 91-92.

65.     Sgt. Timothy Klopp walked over to the squad car and asked Johnson to provide his birthday so that the officers could determine whether Johnson in fact had a warrant in his name. Johnson, however, remained belligerent and hostile and refused to tell Sgt. Klopp his birthday. Ex. A, Johnson Dep., pp. 84-85, 90-91.

66.     Johnson testified at his deposition that he did not sue Officer Zingre because "she did not do anything to me." Ex. A, Johnson Dep., pp. 91-92.

67.     Johnson testified that he had no interaction with Officer Tison at the scene and no reason to sue him. Ex. A, Johnson Dep., p. 95.

68.     Officer Latham advised dispatch that Johnson was being placed under arrest for resisting and for obstructing the police¢s investigation. Latham then transported Johnson to the Jerome Combs Detention Center. Ex. D, Latham Dep., pp. 122-126.

69.     The police reports written by Officers Latham and Zingre both indicate that Officer Latham was the arresting officer. Ex. D, Latham Dep., pp. 125, 161-163.

**The Aftermath**

70.     After being booked at the Jerome Combs Detention Center, Johnson bonded out

approximately an hour later.  Ex. A, Johnson Dep., pp. 116-118.

71.     Six days after the events which occurred on February 18, 2014, Johnson filled out a request for investigation with the Kankakee Police Department.  Fact Sheet, attached hereto as Exhibit J; Ex. A, Johnson Dep., pp. 119-122.  Johnson claimed in the request that Officer Latham had pushed him and slammed him against the squad car but Johnson did not indicate in his request that Latham had ever taken him to the ground, put his knee in his back, or punched him.  *Id.*

72.     Johnson did not even mention Officer Zingre in the request form nor did he say that Officer Tison did anything to him.  *Id.*

73.     When Johnson later appeared in court, Johnson was told that charges had been dropped.  Ex. A, Johnson Dep., pp. 31-32; Ex. D, Latham Dep., pp. 121-124, 236-237.

<u>**ARGUMENT**</u>

**I.     THERE IS NO EVIDENCE THAT OFFICERS ZINGRE
         AND TISON FAILED TO INTERVENE IN OFFICER
         <u>LATHAM'S (ALLEGED) USE OF EXCESSIVE FORCE</u>**

Johnson claims in his two federal counts (Counts I & III) that he was subjected to

excessive force and falsely arrested, respectively, by Officer Latham.  Johnson claims in Count II

of the Amended Complaint that bystander Officers Lacey Zingre and Gary Tison allegedly failed

to intervene to prevent Officer Latham from using excessive force, in violation of 42 U.S.C. §

1983.  There is no evidence, however, supporting this allegation against Officers Zingre and

Tison.

Excessive force is force applied "maliciously and sadistically to cause harm," as opposed to

force applied "in a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503

U.S. 1, 5 (1992).  Courts considering excessive force claims consider the need for force, the

relationship between the need and the force applied, the threat reasonably perceived by the police,

and the efforts made to temper the severity of the force employed.  *DeWalt v. Carter*, 224 F.3d

607, 619 (7th Cir. 2000), *citing Hudson*, 503 U.S. at 7.

A plaintiff must do more than just allege excessive force by a first police officer to prevail

on a "failure to intervene" claim against a bystander officer.  A plaintiff must allege and prove

both that a bystander officer was present and that he or she could have intervened to prevent the

first officer from infringing on the plaintiff's rights.  *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir.

1994); *see also Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2013) (each

defendant must either directly have participated in the alleged violation, ordered the violation, or

otherwise failed to prevent the violation from happening when he reasonably could have

prevented the violation).

Accordingly, a bystander officer can only be liable when he both had reason to know that

excessive force was being used by another officer **and** had a realistic opportunity to intervene to stop excessive force from occurring. *Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014). A "realistic opportunity" means that the bystander officer had both sufficient time and was in a position to stop the first officer's use of excessive force. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). For example, in *Miller*, the Seventh Circuit granted summary judgment in favor of a bystander officer since that officer had no reason to know that the first officer would strike the plaintiff and "could not have known it until the moment that [Officer] Gonzalez landed on Miller's jaw, and by then it was too late." *Miller,* 761 F.3d at 826; *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (a non-intervening officer had no opportunity to prevent three punches thrown in quick succession); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31 (11th Cir. 2008) (a second officer could not have anticipated or stopped another officer's punch to plaintiff's abdomen).

Although most of the testimony in this case shows that Officer Latham was not guilty of police brutality, Johnson himself testified that he was wrestled to the ground and punched several times by Latham, and later slammed against the trunk of a squad car (SOF ¶¶ 48-49, 54-55). Since Johnson's own account suggests that Officer Latham used excessive force and since Latham was without question the arresting officer, Latham has not moved for summary judgment on Johnson's federal excessive force claim (Count I) or federal false arrest claim (Count III).

Johnson's failure to intervene claim however cannot stand since there is no evidence that either Zingre or Tison ever witnessed Officer Latham use excessive force. First, night had already fallen when the officers arrived (being 7:00 p.m. in February) and it was dark outside (SOF ¶ 20). Accordingly, it would have been difficult for Officers Zingre and Tison to see exactly what was going on outside, particularly since the various events did not all occur at the same place or at the same time. Second, when Officer Latham was allegedly using excessive force against Johnson,

14

Officers Zingre and Tison were dealing with Johnson's entourage, who had streamed out of Johnson's house and who were approaching and threatening the officers (SOF ¶¶ 39-41). By all accounts, the situation at the time was extremely "chaotic" (SOF ¶ 42) and the danger to the police increased exponentially when the instigator of the events that night, Porter Chandler, returned to the scene and attempted to intervene on Johnson's behalf, which resulted in Chandler being tased by Officer Tison and arrested by Officers Tison and Zingre (SOF ¶¶ 43-45).

Accordingly, while the Defendants and the independent witness, Ray Norrick, have all denied Johnson's account of the events, there is still no evidence that Officers Zingre and Tison were in a position to intervene to stop Officer Latham, even if one credits Johnson's account of the events. According to Johnson, Officer Latham grabbed his arm, walked him towards the street, wrestled him to the ground and punched him after he was on the ground (SOF ¶ 48). Johnson, however, admitted that these events happened so quickly that he does not even recall how he ended up on the ground (SOF ¶ 49). More importantly, Johnson was not able to place Officers Zingre and Tison in the immediate area when Officer Latham allegedly used excessive force against him (SOF ¶¶ 51, 56-57). In fact, Johnson admitted at his deposition that neither Officer Tison nor Zingre did anything against him (SOF ¶¶ 66-67), which suggests that Johnson's failure to intervene claim is based not on evidence but instead is a product of overzealous representation by Johnson's attorney.

Even if Officers Zingre and Tison had been a bit "closer to the action," they would still be entitled to summary judgment. In deciding whether a bystander officer had a realistic opportunity to intervene, courts consider the duration of the excessive force, the number of blows involved, and the positions of the bystander officers relative to the altercation. *Howard v. Ealing*, 876 F.Supp.2d 1056 (N.D. Ind. 2012). When excessive force consists of a few blows made in quick succession, an officer does not have a realistic opportunity to intervene. *Lanigan v. Vill. of East*

*Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) (affirming dismissal of a failure to intervene claim when the only allegations were of a single poke and push); *Thomas v. City of Fort Wayne*, 2008 WL 282348, at \*5 (N.D.Ind. 2008) (bystander officers could not have intervened to stop the force used in pulling the plaintiff out of a car and allegedly striking him in the head and stomping on his legs when it only took seconds to pull the plaintiff out of the vehicle, and the events happened very quickly and may not have even been visible to the bystander officers).  In this case, the alleged excessive force occurred quickly and there is no indication that either Zingre or Tison were in a position to prevent Latham's alleged force.

In conclusion, there is no evidence that Officers Tison and Zingre ever witnessed Officer Latham use excessive force against Johnson or that they were sufficiently close to the action that they could have intervened to prevent Officer Latham's alleged use of excessive force.  Therefore, summary judgment should be granted as to Count II.

## II.  SUMMARY JUDGMENT MUST ALSO BE GRANTED ON PLAINTIFF'S FALSE ARREST CLAIM AGAINST OFFICERS ZINGRE AND TISON

In Count III, Johnson has sued all three police Defendants for false arrest.  To prevail on a false arrest claim under the Fourth Amendment, a plaintiff must allege and produce evidence that a person was involuntarily restrained without reasonable grounds to believe that the person had committed an offense.  *Hayes v. Florida*, 470 U.S. 811, 815-816 (1985).  Courts consider whether a search or seizure (arrest) was made and also whether a particular defendant's conduct was reasonable.  *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010).  The question of probable cause is not considered to be an "antecedent to this two-step inquiry but rather is a subset of the larger reasonableness inquiry of the second step." *Id.*  Recoverable damages for a successful § 1983 false arrest claim "cover the time of detention up until issuance of process or arraignment, but not more." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994).

It is undisputed that Johnson was placed under arrest on February 18, 2014 by Officer Latham. Officer Latham has not moved for summary judgment on the false arrest claim against him because Johnson's testimony creates a question of material fact regarding whether Officer Latham had probable cause to arrest him (either because of an outstanding warrant against another Anthony Johnson or because of Johnson's obstruction of Officer Latham at the scene).[3] But none of this is of any consequence with respect to Johnson's false arrest claim *against Officers Tison and Zingre*.

Liability under § 1983 requires direct, personal responsibility for a claimed deprivation of a plaintiff's constitutional right. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). A police officer cannot be liable in a § 1983 action unless he "caused or participated in an alleged constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012), *citing Wolf-Lillie*; *see also Dishman v. Cleary*, No. 07 C 5626, 2011 U.S. Dist. LEXIS 34513 (N.D. Ill. Mar. 29, 2011) (officers who did not have any interaction with the plaintiff at the scene of the arrest were entitled to summary judgment because they did not cause or participate in the constitutional deprivation).

Johnson himself appears to understand this important legal concept since he testified at his deposition that he had not sued Officers Tison and Zingre, observing that he had "no reason" to sue these officers (SOF ¶¶ 66-67). Unfortunately, Johnson's attorney must not have conferred with his client as to who Johnson was actually suing and opposing counsel apparently believes

---

[3] After speaking with Ray Norrick at his house, Officers Latham and Zingre knew that a crime had been committed (criminal damage Norrick's property) and the officers also knew that Johnson lived next door and that it had been Johnson's cohorts who had been throwing snowballs at Norrick's house, one of which went through Norrick's bedroom window (SOF ¶¶ 13-21). Accordingly, at the time of the initial encounter between the police and Johnson, the police had "a reasonable suspicion of criminal activity" and therefore had the right under *Terry v. Ohio*, 392 U.S. 1 (1968), to investigate the circumstances regarding Norrick's broken window.

that his client can sue all three officers for false arrest simply because of their presence at the scene. That is not the law, however, *see Dishman*, *supra,* and there are several reasons why Officers Zingre and Tison are entitled to summary judgment. First, Officer Latham was the arresting officer, and he and he alone made the decision to arrest and handcuff Johnson (SOF ¶¶ 32-33). Second, Officer Latham was Officer Zingre's field training officer that evening and was responsible for Zingre's actions and decisions (SOF ¶ 6). Third, there is simply no evidence that Officers Zingre and Tison had any meaningful involvement in Johnson's arrest. Finally, since Officers Zingre and Tison were not with Officer Latham during the entire course of events, having spent most of their time dealing with Porter Chandler and the rest of Johnson's entourage, neither Zingre nor Tison would have been in a position to challenge Officer Latham's decision to arrest Johnson for obstructing Latham. Accordingly, summary judgment should be granted in Officer Zingre and Tison's favor as to Count III of the Amended Complaint.

## III. OFFICERS ZINGRE AND TISON ARE ENTITLED TO QUALIFIED IMMUNITY(APPLIES TO BOTH COUNTS II & III)

Qualified immunity gives law enforcement officers the benefit of the doubt when pre-existing law would not make clear to a reasonable officer that his actions violate the Constitution. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). Under the doctrine of qualified immunity, police officers and other public officials are "liable for transgressing bright lines" but not for making "bad guesses in gray areas." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007). Once a qualified immunity defense is raised, it then becomes the plaintiff's burden to defeat it. *Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012).

Courts apply a two-part test when considering questions of qualified immunity, although courts are not required to look at the two parts in sequential order. *Pearson v. Callahan*, 555

U.S. 223, 236 (2009). To avoid qualified immunity, a plaintiff (1) must present evidence establishing that the defendant violated the plaintiff's constitutional rights, and (2) also that the right allegedly violated by the defendant was "clearly established" at the time of the alleged misconduct. *Id.* at 232. The second part of the qualified immunity test requires courts to consider whether the law was clearly established "in light of the specific context of the case, not as a broad general proposition." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). As long as a reasonable officer could have believed that his actions were lawful, the officer is entitled to qualified immunity. *Reichele v. Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Ashcroft v. Al-Kidd*. 563 U.S. 731, 131 S. Ct. 2074, 2083 (2011) (the "contours of a right [must be] sufficiently clear that *every* reasonable official would have understood that what he is doing violates the right.") (emphasis added).

Because of this case law, it is not enough to say that police officers cannot stand idly by while their colleagues use excessive force or that the Fourth Amendment prohibits arrests without probable cause. Rather, the question for purposes of Officers Zingre and Tison's entitlement to qualified immunity is whether *their specific conduct* would have been readily seen in light of existing law by any reasonable police officer as being unconstitutional. The answer to that question in this case is a resounding "no." As recounted in Sections I and II, *supra*, there is no evidence that Officers Zingre and Tison ever witnessed Officer Latham engage in police brutality, nor is there evidence that either officer had any meaningful involvement in Johnson's arrest. Since the law in February 2014 would not have informed either officer that their conduct (or lack of conduct) violated Johnson's constitutional rights, Officers Zingre and Tison are entitled to qualified immunity.

**IV. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO PLAINTIFF'S STATE LAW MALICIOUS PROSECUTION CLAIM AGAINST OFFICER LATHAM (COUNT VII)**

To establish a malicious prosecution claim under Illinois law, a plaintiff must allege and prove: (1) the commencement or continuation of criminal proceedings by the defendant, (2) the termination of the proceedings on the merits in his favor, (3) the absence of probable cause for the prosecution, (4) the presence of malice on the part of defendant, and (5) damages. *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 934, 415 N.E.2d 481 (1980). Malicious prosecution suits are disfavored under Illinois law because public policy favors the exposure of potential crime, *Joiner v. Benton Cmty. Bank*, 82 Ill.2d 40, 44, 411 N.E.2d 229, 231 (1980); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921 (7th Cir. 2001), and malicious prosecution claims have a chilling effect on individuals who report crime as well as the police officers who are obligated to investigate potential crimes.

Johnson alleges in Count VII that Officer Latham "maliciously commenced a criminal proceeding against Plaintiff without probable cause" (Am. Comp. ¶ 66). However, conclusory allegations that a defendant "caused and procured" a criminal prosecution are insufficient to state a claim for malicious prosecution. *Jacobson v. Rolley*, 29 Ill. App. 3d 265, 266, 330 N.E.2d 256, 257 (4th Dist. 1975). Simply being arrested does not satisfy the judicial proceedings requirement, since malicious prosecution and false arrest are analytically separate claims. *Barrow v. Blouin*, 38 F. Supp. 3d 916, 922 (N.D. Ill. 2014). A plaintiff who is only arrested and detained does not have a claim for malicious prosecution.

Additionally, the Supreme Court has observed that a malicious prosecution action against anyone other than a prosecutor is "anomalous" since a State's Attorney, and not the police or a private citizen, prosecutes a criminal action. *Albright v. Oliver*, 510 U.S. 266, 279, at n.5 (1994); *Buckley v. Fitzsimmons*, 256 F.3d 747, 752 (7th Cir. 1994) (responsibility for a prosecution rests

with a prosecutor rather than the police).  Prosecutors, not police officers, decide whether to charge an individual with a crime, question witnesses before a grand jury, and decide whether to continue or abandon a prosecution.  *Imbler v. Pachtman*, 424 U.S. 409, 427-28, 96 S.Ct. 984 (1976).  Since a police officer does not *commence* criminal proceedings against a suspect (which is the first element of a malicious prosecution claim), summary judgment should be granted as to Count VII.

Moreover, allowing a malicious prosecution claim under these facts is particularly inappropriate since there is no evidence that Johnson was ever charged with anything after his arrest.  A criminal proceeding is commenced by the filing of a complaint, information or an indictment.  *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 733 N.E.2d 835 (1st. Dist. 2000).  In this case, Johnson testified that the case against him was dropped when he first appeared in court (SOF ¶ 73) and there is no evidence that Johnson was ever indicted or that prosecutors ever filed a complaint or information against him.  Since the State never indicted nor pressed charges against Johnson, in this case there is at most an allegedly wrongful arrest, not a malicious prosecution.  In fact, this case presents the same exact situation as in *Barrow*, *supra*.  In that case, an Illinois district court dismissed the plaintiff's malicious prosecution claim when the plaintiff did not affirmatively assert that he was "formally charged with a crime through a complaint, information or indictment." 38 F. Supp. 3d at 922. Although the plaintiff in that case had been arrested, detained and subsequently presented to a judicial tribunal, the court observed that "the fact that an arrestee is released from custody at the same time he is supposed to appear before a judge does not necessarily mean that criminal proceedings had commenced against the arrestee." *Id.*  The court further noted that the point of an initial hearing is for the State to announce whether criminal proceedings will ensue and that this initial hearing does not prove that the State ever commenced with criminal proceedings against the plaintiff, at least for purposes of

alleging a malicious prosecution claim. *Id.* Accordingly, under *Barrow,* Johnson cannot show that criminal charges were ever commenced against him.

Finally, Johnson cannot show malice by Officer Latham nor damages arising from the alleged prosecution against him. In this case, Officer Latham and Johnson did not know each other before the evening in question and there is no evidence that Officer Latham was acting for any reason other than to investigate Mr. Norrick's claim of damage to his property. In the absence of any bad faith by Officer Latham, summary judgment should also be granted as to Count VII of the Amended Complaint.

## CONCLUSION

Defendants Lacey Zingre and Gary Tison ask that summary judgment be granted in their favor. Additionally, Defendant Brad Latham asks that summary judgment be granted in his favor on Johnson's state law malicious prosecution claim (Count VII).

Respectfully submitted,

**s/ Jason W. Rose**
JASON W. ROSE, Atty Bar No. 06208130
MICHAEL W. CONDON, Atty Bar No.06192071
*Attorneys for the City of Kankakee Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
Phone: 630-773-4774 Fax: 630-773-4851
mcondon@hcbattorneys.com
jrose@hcbattorneys.com

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| ANTHONY JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  14 CV 2155 |
| | ) | |
| v. | ) | Judge Colin Stirling Bruce |
| | ) | Magistrate Judge David G. Bernthal |
| OFFICER LATHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2016, I electronically filed the foregoing *Lacey Zingre and Gary Tison's Motion for Summary Judgment and Brad Latham's Motion for Summary Judgment (only as to Count VII of the Amended Complaint)* with the Clerk of the U.S. District Court for the Central District of Illinois, Urbana Division, using the CM/ECF system, which will send notification to the CM/ECF participants:

TO:    Mr. Blake W. Horwitz
       The Blake Horwitz Law Firm, Ltd.
       111 W. Washington Street
       Suite 1611
       Chicago, IL  60602
       Ph:    312-676-2100
       Fax:   312-445-8741
       bhorwitz@bhlfattorneys.com

                          **s/ Jason W. Rose**
                          JASON W. ROSE, Atty Bar No. 06208130
                          MICHAEL W. CONDON, Atty Bar No.06192071
                          *Attorneys for the City of Kankakee Defendants*
                          HERVAS, CONDON & BERSANI, P.C.
                          333 Pierce Road, Suite 195
                          Itasca, IL 60143-3156
                          Phone: 630-773-4774
                          Fax:  630-773-4851
                          mcondon@hcbattorneys.com
                          jrose@hcbattorneys.com